No. 62.—WILLIAM SMITH and ALFRED SHORTER, security on appeal, plaintiffs in error, *vs.* DANIEL R. MITCHELL, defendant.

[1.] It is not the right of the parties to poll the Jury in civil causes, but it is discretionary with the Court to allow them to be polled or not.

[2.] The dispersion of the Jury, after the verdict is handed in to the Clerk, and before it is received by the Court: *Held*, to be a good reason for a refusal to permit the Jury to be polled.

[3.] If the proper parties are not before the Court, and the Court cannot make a complete decree without affecting their interests, the objection may be taken at the trial and the bill will be dismissed.

[4.] The mere non-joinder of a party, who might be a proper party, but whose absence works no prejudice to the rights of those who are before the Court, is not a fatal objection to the Court's proceeding to a decree, and the bill will not be dismissed on that account at the hearing.

[5.] If one in treaty with another for the sale of property, misrepresents a material fact, stating it to be true, when at the same time he knows it to be false, and the other party trusts to the statement and acts upon it, it is a positive fraud, for which Equity will rescind the contract.

[6.] Such a fraud may be perpetrated by acts as well as by words, and by any artifices designed to mislead, as well as by representations.

[7.] Whether a party thus misrepresenting a fact, knows it to be false or not, is wholly immaterial; for the affirmation of what one does not know to be true, or believe to be true, is equally, in morals and in law, as unjustifiable as the affirmation of what is known to be positively false. It is a fraud on account of which Equity will rescind the contract and reinstate the parties in their original rights.

[8.] If a party thus affirming a fact *believes it* to be true, when it is false, it is a fraud *in Law*, and Equity will rescind the contract and restore the parties to their original rights.

[9.] And if a party innocently, by mistake, misrepresents a fact, which is material, and to which the other party trusts, it is cause for rescinding the contract, because it operates as a surprise and an imposition upon him.

In Equity, in Floyd Superior Court. Tried before Judge WRIGHT, October Term, 1848.

Daniel R. Mitchell filed his bill of complaint in Floyd Superior Court, charging that on the 12th of May, 1841, being owner of a valuable tract of land lying near the city of Rome, in the fork of the Oostanaula and Etowah Rivers, it was agreed and contracted between him and one William Smith, that Smith would purchase the said land at the sum of $8,000 ; whereupon, Smith gave complainant his notes, one for $2,000, due December 25th, 1842, and the other for $6,000, due 25th December, 1843, and Mitchell gave his bond for titles.   It was further agreed, at the same time, that if Smith should be unable to pay the notes, then Smith was to pay a reasonable rent per annum for the premises, and also $1,000 for the premises whereon the abutment of a contemplated bridge should be built, with the right of way through the land. Early in the year 1842, Smith stated to Mitchell, that he had made an arrangement with a Bank in Columbus, to take in payment of certain claims on the Western Bank of Rome, such notes as Mitchell, John H. Lumpkin and Thomas C. Hackett would say were good, and requested Mitchell to make a statement concerning a note on William H. Moore, of Alabama.   Mitchell declined, stating that when he knew Moore, he was good, but that times were uncertain, and that he had heard nothing of him for some years back.   The bill charges, that Smith and one Hugh M. Cunningham, of the State of Alabama, combining to defraud complainant, Smith procured from Cunningham, a letter directed to Smith, in which he stated in substance, that he boarded with Moore, and knew his situation as well as Moore did himself; that he did not owe more than $20 or $30,000, and owned two hundred negroes and three or four of the best plantations in Talladega, and if his property was sold, it would bring at least $100,000 ; that he considered him as good as any man in Alabama, and, moreover, that he had a claim against the United States of $40,000.   Upon the presentation of this letter, complainant, (Mitchell,) having the utmost confidence in Cunningham, made a written statement, as desired by Smith, of the solvency of Moore.   Shortly afterwards, Smith applied to Mitchell to know if he would take Moore's note for the notes ($8,000) he held on Smith, which Mitchell agreed to do if Cunningham would indorse the note. Smith assured complainant that Cunningham would do so, and then inquired, if Cunningham should be absent, or any thing happened, so that he might not procure his indorsement, would any

other good name do; to which complainant replied, he would take any body that was good. Smith said there was Tom Jones and Grief Harwell, that he knew were good, and he could get them. About 11th April, 1842, Smith tendered Mitchell with a note purporting to be signed by Moore, and Jones and Harwell as sureties, for $7,500, in satisfaction, together with $500 which Mitchell had promised as a *bonus* to Smith, whenever he launched a steamboat at Rome, of the notes of Smith for $8,000. Smith, the bill charges, again represented that Jones and Harwell were good, and that Moore was also good, and gave as a reason why Cunningham had not indorsed the note, that he was gone to Mobile, and again exhibited the letter of Cunningham before set out. The bill charges, that from these fraudulent and false representations of Smith and Cunningham, complainant was induced to give up his notes for $8,000 and receive the note for $7,500, and at the same time made a deed to the land to Smith.

The bill farther charges, that Moore was wholly insolvent, and was generally known to be so for several months before the letter of Cunningham was written; that Jones and Harwell were, at that time, and for a long time previously, utterly and hopelessly insolvent; that Moore was not in Alabama, but was in Washington City, Arkansas or Texas, at the time said note, purporting to be made by him, bears date; and that the same, whenever or wherever made, was prepared for the express purpose of perpetrating a fraud on the complainant or some one else; that Cunningham was not gone to Mobile, as falsely stated by Smith, and that the insolvency of Moore, Jones and Harwell was well known to Smith, and unknown to the complainant. The bill farther charged, that Smith had boasted he could " cheat Mitchell out of his eyes, and he wide awake."

The bill prayed that the deed to the land might be delivered up to be cancelled, and that Smith and Cunningham may be decreed to comply with the original contract of sale, and then receive titles, or that the said William Smith may be decreed to do so and to receive back the note of Moore, Harwell and Jones, or that the whole contract may be rescinded.

The answer of Smith admitted the sale and the agreement at the time, but insisted that the notes for $8,000 were to be discharged by other good notes. He denied that the letter of Cunningham was written before complainant gave the recommenda-

Smith and Shorter *vs.* Mitchell.

tion to the Bank, and stated that complainant said he knew Moore's condition, and was willing to take the note upon his own knowledge, but that he would like to have Cunningham's opinion about the indebtedness of Moore, and that the letter was written under these circumstances. He denied that the recommendation was procured by any fraudulent representation of himself or Cunningham. He denied that he applied to the complainant to take Moore's note, but that the complainant voluntarily proposed to take the note of·Moore, stating that he knew him and knew his note to be good; and farther denied any fraudulent intention in transferring the note. He denied that complainant offered to take the note, provided Cunningham would indorse it; on the contrary, the complainant agreed to take Moore's individual note. Some time afterwards, the complainant asked defendant if Cunningham would not indorse it. Defendant replied that complainant knew Cunningham was not in the habit of indorsing notes for any person. Complainant said if Cunningham would not indorse it, perhaps Harwell and Jones would, and that would be satisfactory. He denied making any representation at that or any other time, as to the solvency or ability of Jones or Harwell, but concurred in opinion with complainant, that Moore was good—remarking, at the time, that complainant knew him better than he did. He denies that he knew Moore to be insolvent, nor does he now believe that he is. He does not know anything about the absence of Moore at the time the note was signed, but denies that it was procured with any fraudulent intention. The answer stated fully the consideration paid Moore for the note. He denied ever boasting that he could cheat Mitchell out of his eyes. The answer fully and distinctly denied every allegation of fraud or fraudulent intention.

The defendant, Cunningham, answered that portion of the bill charging confederacy on him, admitted the writing of the letter, insisting it contained the truth, and denied all fraudulent intention. On the first trial there was a decree against Smith.

At the April Term, 1848, the death of Hugh M. Cunningham being suggested, the case being on the appeal, on motion, it was ordered, that complainant have leave to amend his bill by striking out his name. At the same term, (April, 1848,) an order was entered on the minutes, that the defendants have leave to except to

the opinion of the Court, that the complainant could proceed against the surviving defendant at the trial term.

At the October Term, 1848, the cause came on for trial, when the counsel for defendants objected to the complainant's proceeding until the representative of Cunningham was made a party. The Court overruled the objection, and the counsel for defendants excepted.

There was a great volume of evidence submitted to the Jury and embodied in the bill of exceptions, with reference to the insolvency of Moore, Jones and Harwell, at the time of the exchange of the notes. The testimony was in some degree conflicting] as to the *notoriety* of Moore's insolvency at the time. There was no conflict in the testimony showing that Jones and Harwell were notoriously insolvent. Moore, Jones and Harwell lived in Talladega County, Alabama, some ninety miles from Rome, where Mitchell and Smith resided. It was in evidence that Smith was frequently in Talladega, about the time Moore commenced to be suspected of failure, and had dealings with Moore, and that Mitchell never was there. There was evidence of several circumstances insisted on by the complainant, as proving notice to Smith, and there were other circumstances relied on by defendants, to show that Mitchell did not rely on Smith's statements in the making of the transfer. There was also evidence to show that the note was not genuine as to the signatures of Moore and Harwell.

It is unnecessary, for the proper understanding of the decision of this case, to embody more of this mass of testimony in this statement.

The counsel of defendants requested the Court to charge the Jury, "If the solvency of Moore was a matter of opinion or a fact, equally open to the inquiry of both, and there was no special confidence or relation between the parties, and each met the other on equal grounds, the mistaken opinion of Smith as to Moore's solvency, expressed to Mitchell, the plaintiff, (if expressed at all,) is not sufficient to avoid the contract of sale." Which charge the Court refused to give as asked, but charged the Jury, that this was the law, with this qualification—that if Smith represented Moore to Mitchell to be solvent, and Mitchell relied upon the statement of Smith, it was sufficient to avoid the contract.

The counsel for defendants requested the Court to charge the

Smith and Shorter *vs.* Mitchell.

Jury, that "to constitute the fraud complained of, Smith must have represented Moore to be solvent, when in truth and in fact he was insolvent, and that Smith knew it." This charge the Court refused to give, but charged, that "if Smith represented Moore to be good, when at the time he was insolvent, and Mitchell relied upon Smith's statement, it was immaterial whether Smith knew of his insolvency or not; it was a fraud, and was sufficient to set aside the contract."

After the charge, the Jury were taken to their room, and sometime after night the Judge came upon the bench to receive the verdict, but the Jury not coming into Court, the Judge directed the Clerk to receive the verdict when the Jury should be ready to deliver it; which was accordingly done in the absence of the Court, the Judge having retired to his lodgings. The next morning, at the meeting of the Court, the Jury being assembled and called, the counsel for the defendants moved that the Jury should be *polled*, and each Juror asked if he had agreed to the verdict, insisting that the verdict had been delivered to the Clerk, in the absence of the Court, without the consent of defendant or his counsel, and in the absence of defendant's counsel. The plaintiff's counsel objected because the Jury had dispersed. The Court overruled the motion.

All of which decisions, charges, and refusals to charge, and refusal to have the Jury polled, were excepted to and are alleged here as error.

ALEXANDER, UNDERWOOD & TRIPPE, for plaintiffs in error.

W. AKIN and C. J. McDONALD, for defendant in error, cited and commented on the following authorities:

2 *Cowen*, 438. 3 *Term R.* 51. 10 *Wend.* 412. 13 *Wend.* 277. 19 *John. R.* 290. *Chitty on Contracts*, 447, 448, 450, 451, 452, 453. 2 *Nott & McCord*, 76, 538.

1 *Nott & McCord*, 142. 2 *Kelly's Rep.* 71.

1 *Story's Com. on Eq.* 202. 2 *Kelly*, 72. 6 *Term R.* 637. 13 *Peters*, 26. 2 *Peters' Dig.* 357, §§44 *and* 45. 2 *Cow.* 129. 1 *Story Com. on Eq.* 121, 158, 161. 1 *Madd. Ch.* 262.

1 *McCord's R.* 24. *Ib.* 525. 1 *Chitty's Crim. Law*, 634. 4 *Pick. R.* 239. 12 *Pick.* 496. 5 *Greenl. R.* 333.

3 *McCord's R.* 276, 467.   2 *Salk.* 646.   3 *John. R.* 532.   4 *Term R.* 4.   6 *Wend.* 436.   7 *Wend.* 160.   1 *Kelly,* 556.   *Ib.* 580.

1 *Cowen,* 306.   5 *Wend.* 87.   11 *John. R.* 408.   5 *Wend.* 490.   1 *Cowen,* 382.   5 *John.* 68.   9 *Ib.* 310.   11 *Wend.* 9.   13 *Ib.* 101.   1 *McCord,* 454.   7 *Durnford & East,* 64.   *Chitty on Bills,* 173.

16 *John. R.* 201.   15 *Ib.* 240, '1.   6 *Ib.* 5.   6 *Conn.* 484, 491.   2 *John. R.* 455.   *Chitty on Contracts,* 750.

2 *Paige's Ch. R.* 128.   2 *McCord's Ch. R.* 421.   1 *Smith Ch. Pr.* 512.   3 *Kelly,* 261.   6 *Ves. R.* 182, '3.

1 *Story's Eq. Jur.* §192.   1 *Story's Cir. Ct. Rep.* 172.   1 *Burrows' R.* 475.

*Broderick vs. Broderick,* 1 *Peere Wms.* 240.   13 *Peters,* 119.   *Story's Eq. Jur.* §193.   13 *Peters,* 36.

4 *Pick.* 242.   12 *Pick.* 512.

*Fox vs. Smith,* 3 *Cow.* 23.   1 *Chitty's Crim. Law,* 635.


*By the Court.*—NISBET, J. delivering the opinion.

[1.] The verdict in this case was handed to the Clerk, by order of the presiding Judge, in the recess of the Court, at night, and without the consent of the defendant, Smith, or his counsel. In the morning, the Jury having dispersed, and being now in Court, the defendant moved to examine them by the poll, whether they had agreed upon a verdict. The motion was refused. Under the circumstances of this case we do not think that the Court erred in this refusal. It does not appear from the record, that the verdict had been recorded when the motion to poll the Jury was made. I conclude, as a matter of legal inference, that it was not recorded. It cannot be recorded until returned, and when returned, can be recorded only upon the order of the Court. The delivery of the verdict to the Clerk, is no return—it was delivered to him simply for safe keeping until the Court should meet. If he had spread it upon the record, the record would have been a nullity. Being delivered to the Clerk, it was still necessary that it be read and received in open Court, and in the presence of the parties, that, before record, they might make all proper legal objections to its going to record. In criminal cases, I should hold the delivery of the verdict to the Clerk, and a dispersion of the Jury before its return, altogether irregular, and in civil cases,

Smith and Shorter vs. Mitchell.

a dangerous and highly inexpedient practice—particularly without the consent of the parties.

Because, although it is not the right of the parties, necessarily, to poll the Jury, yet it is a privilege within the discretion of the Court, which it will not, without good reason, deny to them ; and the dispersion of the Jury, after the verdict is handed in to the Clerk, and before its reception by the Court, must always be a good reason for denying it. I take it for granted, that the verdict here had not been, because it could not have been, legally recorded, when the demand was made to poll the Jury. The unanimous agreement of the Jury is necessary to make their verdict legal. The verdict is the judgment of twelve men, freely rendered, upon the issue submitted to them for trial. Whether it be right upon principle, or prudent as to expediency, to require unanimous verdicts, are questions about which much may be said, both affirmatively and negatively, but which are not for our determination. Each Juryman is bound by his oath to give his verdict, and it is his unquestionable right, and his solemn duty, to withhold his assent to a verdict which his mind and conscience cannot approve. From these propositions it follows, that it is his right to object to the record of a verdict, returned by his fellows, to which his mind and conscience do not assent. Farther, it is the right of the parties, that each Juror should agree to the verdict—without this it is no verdict. Not only so, but it is their right *to know* that each Juryman has agreed upon the verdict. The only question is, *how is it to be ascertained that the Jury have agreed?* I reply, it is the duty of the Court to see to it, that each Juror agrees to the verdict, and it is within his discretion to adopt such means as the law and the usage of the Courts allow, to ascertain that fact. Among these means is the examination of the Jury, when they return their verdict, individually, or, as it is called, by the poll. This may be done whenever the Court, on any account, has reason to believe that the verdict is not unanimous. It may be done at the instance of a Juror, or at the instance of a party. It is our judgment, that in civil causes, (without saying what would be the rule in criminal cases,) it is discretionary with the presiding Judge to poll the Jury or not. We pretend not to prescribe rules for the exercise of this discretion. It is proper, however, to say, that the Jury ought to be polled, whenever there is any good reason to believe, no matter how the

fact is manifested, that any one of the Jury has not agreed to the verdict. To allow the parties the right to examine the Jury in all cases, would be to subject it to an influence which might occasionally, at least, destroy the independence of Jurors, and taint the purity of trial by Jury. The agreement of all the Jury is signified, in our practice, by the written verdict, the signature of the foreman, the call by the Clerk of the names of the Jury, and their tacit acquiescence. Ordinarily these things are sufficient to satisfy the Court that all are agreed. If, however, notwithstanding these evidences of assent, the Court is made to believe that they have not all agreed, whether by suggestion of a party, by facts or circumstances, it ought to order an examination. Over the whole matter the presiding Judge exercises a wise discretion, and in the exercise of that discretion he stands amenable to this Court, by writ of error. *Martin vs. Marwick,* 1 *McCord,* 24. *The State vs. Allen, Ib.* 525. 1 *Bailey,* 3. 2 *Alabama. The People vs. Perkins,* 1 *Wend.* 91. *Commonwealth vs. Roby,* 12 *Pick.* 496, 513. 5 *Greenleaf's R.* 333. 3 *Cow. R.* 23. 18 *Johns. R.* 128. 2 *Hale's P. C.* 299.

[2.] The motion to poll the Jury in this case was properly refused, because they had dispersed before it was made. It would be dangerous in the extreme to permit it after their separation—after each one had been exposed to the action of public opinion, or to the approaches of parties or their friends. Whilst the Juries of our country are as reliable for intelligence and integrity as those of any other country, yet it is possible for them—for one, say, out of the twelve—to be influenced to dissent, particularly in cases involving large amounts, much feeling, or great complexity, and more especially in cases sounding in damages, where the finding, in the very nature of the case, must be the result of compromise and concession. We are clear that the only safe, general rule is to deny the application in all such cases.

[3.] The question in relation to the parties, I consider as free from any difficulty. It is important to know what was the motion, the overruling of which is complained of. Cunningham was a party defendant to the bill. Upon the first trial a decree was had against Smith, and an appeal entered. At April Term, 1848, Cunningham being now dead, and his death suggested, on motion of complainant, (Mitchell,) it was ordered, that the bill be amended by striking out his name. At the same time an order was en-

Smith and Shorter *vs.* Mitchell.

tered on the minutes, " that the opinion of the Court, that the complainant has the right to proceed against the surviving defendant, be so far left open as to allow the defendant to except to the decision as made at the trial term."

At the October Term, 1848, counsel for the defendants moved the Court, that the complainant could not proceed until the representatives of Cunningham were made parties, which motion was overruled, and it is complained that the decision was erroneous. At the previous term, by an order, amounting to a judgment, Cunningham had been dismissed. The supplemental order did not, as we construe the two orders, (for they must be taken together, being in *pari materia*,) leave open what was there adjudged, to wit|: that Cunningham be dismissed; but only reserved to the defendant the right, upon the trial, to except to the complainant's proceeding against the defendants left upon the record. The dismissing of Cunningham was one thing, the right to proceed against the other defendants after his dismission was another. The complainant, upon dismissing Cunningham, took the hazard of being able or not, to proceed to a decree against Smith and his surety on the appeal. To object to his doing so, was the right reserved by the supplemental order—the reservation was scarcely necessary, for the right, I apprehend, would have existed without it. The construction given to the two orders by plaintiffs in error, would place the Circuit Judge in the childish attitude of having passed an order dismissing a party, and at the same moment an order to consider him as not dismissed, but that the question of dismissing him be open.

At the term when the motion of plaintiffs in error was made, Cunningham was not on the record—he had been removed—and there was nothing on the record upon which to found a motion to make his representatives parties. What, then, was the complainant's motion? It was to dismiss the bill, because Cunningham being discharged, his representatives could not be made parties. The motion goes upon the assumption, that in the case made, Chancery cannot decree against the defendants, because the estate of Cunningham is not before the Court. It is competent for the defendant to object at the hearing, that the proper parties are wanting—there are some considerations which modify this rule, but such is the general rule. " If the proper parties are not made, (says Mr. *Story*,) the defendant may either demur to

the bill, or take the objection by way of plea or answer, or when the case comes on to a hearing, he may object that the proper parties are wanting, or the Court itself may state the objection and refuse to proceed to make a decree; or if a decree is made, it may, for this very defect, be reversed on a re-hearing or on an appeal; or if it be not reversed, yet it will bind none but the parties to the suit and those claiming under them." *Story's Equity Plead.* §75. 16 *Vesey,* 325, 326. *Mitford's Eq. Pl. by Jeremy,* 180. 2 *Atk.* 510. 3 *John. Cas.* 311, 316, 317. *Calvert on Parties, ch.* 2, §4. 2 *Danl. Ch. Prac. ch.* 12, §2.

The rule as to parties is variously stated by different commentators and eminent Chancellors; all, however, agree in this—that Chancery will not proceed to a decree unless all parties interested in the subject of the suit are before the Court. *See this question discussed in Rice vs. Tarver and others,* 4 *Ga. Rep.* 586 *to* 588, *and authorities there referred to.*

[4.] Had Cunningham or his estate such an interest in the subject of this suit, as made it impossible for the Court to proceed to a decree without doing injustice to it? Was the presence of his representatives necessary to enable the Court to make a decree which would do *complete* justice and close up the litigation? We think not. The bill shows that he was no party to either the first or second contract between Smith and Mitchell; he had nothing whatever to do with the transactions between these persons in the beginning; and he is in no way connected with the transaction by which the notes of Smith to Mitchell were paid off by Moore's note, except that in a letter to Smith, which he showed to Mitchell, he stated facts in relation to Moore's solvency, and gave his opinion that he (Moore) was solvent. The bill charges a confederacy between him and Smith, founded on this letter, to defraud the complainant, Mitchell. This is all the connection he had in any way whatever with the subject of the suit. *He,* therefore, not being before the Court, a decree against Smith could not have affected him one jot or tittle. The bill does not pray a decree against him at all, and the only reason why he was originally made a party, that occurs to me, was to procure his answer to facts charged upon Smith. He was not a necessary party to the complainant. He might have proceeded *without him in the outset.* The failure to make him a party would have been no good ground for a demurrer to the bill.

Smith and Shorter *vs.* Mitchell.

Having no interest which could be affected by a decree on the case as it stood upon the trial, it was competent for the Court to proceed to make a decree without his presence, or that of his representatives, he being dead, and, therefore, so far as his estate is concerned, the motion of the plaintiffs in error was legally denied; and for the reasons and facts stated, it is perfectly clear that his absence from the case could work no prejudice to the rights of Smith. The mere non-joinder of a party who might be a proper party, but whose absence produces no prejudice to the rights of the parties before the Court, will constitute no fatal objection at the hearing or re-hearing, or upon bill of review. *Story's Plead.* §§74, 236, 541, 544. *Whiting vs. Bank of the United States,* 13 *Peters,* 6, 14.

It is argued, however, that the surety on the appeal, Shorter, is interested in Cunningham's representatives being brought before the Court. A decree against the defendant, Smith, was made before Cunningham's death, and before the order of the Court discharging him. From this decree Smith appealed, and Shorter became his surety on the appeal. Now, it is said, that Shorter is surety for Cunningham; that he has undertaken to respond to the final recovery upon the credit of Cunningham's liability; that if made ultimately liable, he is entitled to go back upon his estate for remuneration, and, therefore, *his* interest requires that Cunningham's representatives should be made parties, and therefore the motion of the plaintiffs in error ought to have prevailed. All this would be true but for two very conclusive reasons: First, there was no decree made against Cunningham whilst he was a party. It is, in terms, against Smith alone. Shorter undertook nothing on Cunningham's credit. He engaged to respond for Smith alone, and if the appeal had been dismissed, and the decree had been thereby confirmed, Cunningham could not have been in any way chargeable upon it. The complainant would have had no right to have sought any recovery out of him—he had no judgment and could have no process. The relation of principal and surety, therefore, did not exist between Cunningham and Shorter. But suppose it did exist—suppose that Shorter did, in fact, undertake for both Smith and Cunningham, and that such is the judgment of the law upon the case—why, then, the subsequent discharge of Cunningham, upon the motion of the complainant, discharged the surety, and for that reason, he, the surety, could

Smith and Shorter *vs.* Mitchell.

not be prejudiced by a decree subsequently rendered. Secondly, at the time the motion of plaintiffs in error was made, Cunningham had been dismissed—no *future* decree could affect him, or rather his estate, and Shorter could not have been made liable on his account. We do not find any error in the Circuit Judge in overruling the motion.

[5.] The errors growing out of the instructions of the Court to the Jury on the law of the case, as claimed by the plaintiffs in error, may be reduced to two specifications. First, it is claimed that the Court erred in not instructing the Jury, as the rule of law to govern their verdict, the following proposition, to wit: "If the solvency of Moore was matter of opinion, or a fact equally open to the inquiry of both, and there was no special confidence or relation between the parties, and each met the other on equal grounds, the mistaken opinion of Smith as to Moore's solvency, expressed to Mitchell, is not sufficient to avoid the contract of sale." Second, it is claimed that the Court erred in instructing the Jury, "that if Smith represented Moore to be good, when at the time he was insolvent, and Mitchell relied upon Smith's statement, it was immaterial whether Smith knew of his insolvency or not; it was a fraud and sufficient to set aside the contract." I do not understand the Circuit Judge as denying the proposition asked to be given in charge to the Jury to be law, but as denying that it is applicable to the case. He admitted it to be law, but with a qualification which altogether changed it, and thus denied its application. The Court and the counsel for the plaintiffs in error, were at issue according to the two specifications which I have made. In considering them I shall have occasion to pass in review all the points made in the record and in the argument. We do not deny the proposition of the plaintiffs in error to be, in substance, sound law.

If two persons are in treaty about the sale and purchase of any article of property—a painting for example—and both have equal means of knowing its value and its merits as a work of art, where neither party is an artist or a connoisseur, and both are ignorant of its history, and the painting is present and open to the inspection of both, in such a case a mistaken *opinion* as to the value or character of the property would not invalidate the sale, for the reason that in such a case it is unreasonable, nay, it would be absurd, to believe that such an opinion influenced the purcha-

ser—he cannot be presumed to have acted upon it, he cannot be presumed to have placed any reliance or trust in it, but is presumed to have acted upon the counsels of his own judgment. There is a distinction, too, to be drawn between a mere opinion and the representation of a fact which is material,. and which may be presumed to have influenced the purchaser. See this distinction taken by Mr. Justice *Barbour* in *Smith vs. Richards,* (13 *Peters,* 38, 39.) If, however, there is confidence reposed in the opinion of the seller; if he is himself an artist; if his means of knowing the character of the painting are better than those of the buyer, the parties do not treat upon equal terms; and if, in such a case, the vendor should represent it as a Titian, when, in fact, it is a daub, the contract would be in Equity rescinded, and at Law the seller would be liable in an action for deceit, whether he knew the statement to be false or not; because, under the circumstances, the law presumes that the buyer acted upon the representations of the seller. Now, the case first put is the case to which the rule of law applies, which counsel desired the Circuit Judge to administer. It applies to all such cases. 1 *Story's Eq.* §197. 13 *Peters' R.* 38. 2 *Kent,* 484, 485. *Hepburn vs. Dunlop,* 1 *Wheat.* 189. But this is not such a case—it is very far from it indeed. All that I have to do with the vast volume of testimony with which this record is needlessly encumbered, is to determine from it the entire irrelevancy of this rule of law to this case. *Here,* a sale of land had been made by the plaintiff below, (Mitchell,) to the defendant, Smith. Mitchell held Smith's notes to the amount of about $8,000 for the purchase money. The matter about which the parties were treating was the payment of these notes, by the transfer of a note made by one Moore, as principal, and Harwell and Jones as sureties. This note was made payable to Smith—it was for a large sum. Moore and his sureties resided in Talladega, Alabama. Smith was frequently at Talladega, knew Moore, was in communication with him, and had procured an intimate acquaintance and neighbor of Moore's to write a letter in relation to Moore's solvency, to wit: Cunningham. He, Cunningham, professed to know all about the condition of Moore, and with Cunningham, Smith was proven to have held the closest business and social relations. Smith was presumed to know, must have known, the consideration of the note. It was greatly his interest to know the situation of Moore—his opportunities of

knowing were good, and far better than Mitchell's.   They did
not treat upon equal terms.   In the very nature of the case,
Mitchell must be presumed to have confided in, and acted upon,
the representations of Smith, and upon the letter of Cunningham,
recommending Moore, which Smith had procured to be written
to himself, and which he showed to Mitchell.   The matter affirm-
ed was a material and vitally important fact—not merely an opin-
ion—to wit: the solvency of Moore and his sureties.   I advert
to these facts to show, that this is not the kind of case to which
the rule, now under consideration, applies.   This Court would
fail to respond to the obligation which rests upon all judicial offi-
cers to sustain the morality of business transactions, if they omit-
ted farther to say, that after a careful attention to all the evidence,
they are convinced that this was a deeply laid, perseveringly pro-
secuted, and adroitly consummated fraud, both in law and in fact.
The Jury of Floyd County have so held it, having twice found
for the plaintiff.   I dismiss this point, and come now to the second
specification of error.

The argument of the able and experienced counsel for the
plaintiffs in error, Messrs. *Underwood & Trippe,* in opposition to
the final charge of the Court, seems to me to be resolvable into
two propositions.   First, that to avoid this contract upon the
ground of the representation of a material fact, upon which the
buyer of the note relied, to wit: the solvency of Moore and his
sureties, which was untrue at the time, its falsity must be known
to the seller.

And second, even admitting the *scienter* to be unnecessary, yet
it is necessary that there should be an *intention* on the part of the
seller to defraud the buyer.   That is to say, that a moral fraud is
necessary, in order to justify a Court of Chancery in rescinding
the contract.   The question whether there is or not a moral
fraud—an intention to perpetrate a fraud—in most cases will, no
doubt, depend upon the question whether the affirmation was
made with knowledge of the falsity of the fact affirmed.   Yet,
no doubt it is true, that there may be a fraudulent intention in
the representation of a fact, where the person making it is igno-
rant whether the fact be true or false.   Whether in actions of de-
ceit, for misrepresentation, or in support of the plea of fraud, in
defence of actions of debt or assumpsit, it be necessary to prove
knowledge of the falsity of the statement relied upon, has been,

Smith and Shorter *vs.* Mitchell.

I am free to admit, and even now may be considered, a question of some doubt in the Law Courts of Great Britain. The original writ of deceit was founded on moral fraud, or an intention to defraud. *Deceit,* actual fraudulent mind and motive, was the gist of the action. The writ itself ran, *fraudulente et maliciose. Fitz. Nat. Brev. p.* 95, *ed.* 1635. *Cro. Eliz.* 44. *Buller, J.* in *Pasley vs. Freeman,* 3 *T. R.* 56. In *Chandler vs. Lopus,* 2 *Croke,* 2, (1 *Smith's Lead. Cases,* 145,) it was held that no action lay against one who sold a stone, affirming it to be a *Bezoar* stone, but which proved not to be so—the majority of the Court agreeing that the defendant must have known that it was not a *Bezoar* stone, or there must be a warranty—*Anderson, J.* dissenting. This case is a leading authority on that side of the question. Lord *Mansfield,* in 1778, expressed a different opinion in *Pawson vs. Watson, Cowp.* 785. His Lordship said, " If in a life policy, a man warrants another to be in good health, when he knows at the same time he is ill of a fever, that will not avoid the policy, because, by the warranty, he takes the risk upon himself; but if there is no warranty, and he says the man is in good health, when in fact he knows him to be ill, it is false. *So it is if he does not know whether he is well or ill, for it is equally false to undertake to say that which he knows nothing of at all, as to say that is true which he knows is not true.*" The morality of this doctrine is summed up in these few words of Lord *Mansfield.* For myself, I can see no difference between a statement that a fact is so, knowing it not to be so, and a statement of a fact without knowing whether it is true or not. A fraudulent intention may be inferred equally in both cases. A man who is treating with his neighbor for the sale of property, is bound, in honor and in christian morality, to speak what he knows to be true, or to be silent. If he does make a statement without knowing whether it is true or false, and it is true, he deserves no credit for it, and if false, he is as much a liar as if he knew it to be false. He means to deceive—he intends that the other party, acting upon his statement, shall take the risk and abide the consequences of its truth or falsehood. He is, therefore, a deceiver. If he *believes* his statement to be true, without knowing it, he may be more excusable in conscience, but not the less liable in law, because the consequences are the same to the other party.

Nor do I believe the rule is less stringent in favor of one who has no interest in the transaction. He, too, should speak knowingly or not at all—he should not mislead others. The law is not unreasonable in visiting liability upon indifference, negligence or indiscretion. He may not carelessly mislead others. If a third person makes representations, knowing them to be false, his having no interest in his iniquity, according to Mr. J. *Buller*, "proves his malice to be the greater." It is like the malice of one who fires into a crowd of men in wanton sport. He has no malice against any one individual; he has no feeling of revenge to gratify, but has that brutal disregard to human life, that brutal indifference to human suffering, which proves malice against the whole race. So he who, without a personal interest in telling a falsehood, wilfully misleads another to the injury of his estate, exhibits proof (to say the least of it), of a fraudulent intent against all men. If, however, one having no interest in the matter, represents a thing to be so, honestly believing it to be true, and it turns out not to be true, even if another acts upon the statement, it may admit of question whether, in morals or in law, he ought to be held liable. Certainly not in morals, and in law his position is very different from that of one who gets an advantage by the transaction. These remarks apply generally with equal force to the suppression of the truth, in entering into contracts, when the suppression works injury to the other party. But I return, now, to the review of the decisions upon this question.

In *Pasley vs. Freeman*, (3 *T. R.* 51,) the decision turned upon the question, whether it was necessary that the person making the false statement should derive a benefit from it, and it was decided that it was not; but the opinions expressed by the Judges in that case, clearly maintain the materiality of knowledge, that the statement is untrue at the time it is made. In *Haycraft vs. Cressy*, (2 *East*, 92,) tried in 1801, the question was directly made, whether knowledge of the fraud by the defendant was essential to an action for a false statement as to the credit of a third person. *LeBlanc, J.* said, "By fraud, I understand an *intention to deceive*, without which the action is not maintainable." *Lawrence, J.* also held, "that the representation must be made *malo animo*." But Lord *Kenyon* held as follows: "It is enough to state that the case rested on this, that the defendant affirmed that to be true, within his own knowledge, that he did not know to be true. This is

fraudulent; not, perhaps, in that sense which fixes the stain of moral turpitude on the mind of the party, but falling within the notion of *legal fraud*, such as is presumed in all the cases within the Statute of Frauds. The fraud consists, not in the defendant's saying that he believed the matter to be true, or that he had reason so to believe it, but in asserting positively his knowledge of that which he did not know." This doctrine, as held by Lord *Kenyon*, was ruled in *Cross vs. Gardener*, (*Carthew*, 90.) In *Schneider vs. Heath*, (3 *Camp.* 506,) Sir *James Mansfield* maintains it in these clear and strong terms : " It signifies nothing whether a man represents a thing to be different from what he knows it to be, or whether he makes a representation which he does not know at the time to be true or false, if, in point of fact, it turns out to be false." In *Adamson vs. Jarvis, Best*, C. J. thus briefly, yet forcibly, expresses the same opinion : " He who affirms either what he does not know to be true, or knows to be false, to another's prejudice and his own gain, is both in morality and law, guilty of falsehood and must answer in damages." 4 *Bing.* 66. In *Humphries vs. Pratt*, (5 *Bligh N. S.* 154,) and in *Railton vs. Mathews*, (10 *Cl. & Fin.* 934,) the *House of Lords* affirmed the same doctrine. Distinctly to the same effect is the opinion of Lord *Abinger*, C. B. in *Comfoot vs. Fowke*, (6 *M. & W.* 358.) His Lordship there said, " Nothing is more certain than that the concealment or misrepresentation, whether by principal or agent, by *design or mistake*, of a material fact, *however innocently made*, avoids the contract on the ground of a legal fraud." The majority of the Court, however, were, in this case, dissentient from the opinion of Lord *Abinger*. In a subsequent case in the Exchequer, the Court, after taking time for consideration, held a different doctrine. *Alderson, B.* delivering the unanimous opinion of the Court, said : " In these cases, it is true, the agent is not actuated by any fraudulent motives, nor has he made any statements which he knows to be untrue, still his liability depends on the same principles as before. It is a wrong, differing only in degree, but not in its essence, from the former case, to state as true what the individual making such statement does not know to be true, even although he does not know it to be false, but believes without sufficient grounds that the statement will ultimately turn out to be correct; and if that wrong produces injury to a third person, who is wholly ignorant of the grounds on which such be-

lief of the supposed agent is founded, and who has relied on the correctness of his assertions, it is equally just that he who makes such assertions should be personally liable for its consequences." *Smout vs. Ilberry*, 10 *M. & W.* 1. Very early after this decision, the contrary was ruled by the same Court, in two cases—*Moens vs. Hayworth*, (10 *M. & W.* 147,) and *Taylor vs. Ashton*, (11 *M. & W.* 401.) Moral fraud was held, in these cases, necessary to liability. In the last of these two cases, the Jury found for the defendants, but expressed the opinion that they were guilty of gross negligence, and adverting to that opinion, the Court say : " From this proposition we entirely dissent, because we are of opinion that, independently of any contract between the parties, no one can be made responsible for a representation of this kind, unless it be fraudulently made." This is going very far indeed. If a representation is made upon which another acts to his injury, and to the benefit of the affirmant, the falsehood of which is within his means of ascertainment, and the want of knowledge of which is the result of gross negligence, I am without doubt that such representation would charge him, not only in damages, but with gross moral delinquency. It is unconscientious for a man to hold an advantage thus acquired. Neither Law nor Equity will permit him to do so. These decisions were followed in the Exchequer Chamber, by the case of *Ormrod vs. Huth*, affirming them. In this case the Court say: " The rule which is to be derived from all the cases appears to us to be, that where, upon the sale of goods, the purchaser is satisfied, without requiring a warranty, (which is a matter for his own consideration,) he cannot recover upon a mere representation of quality by the seller, unless he can show that the representation was bottomed on fraud. If, indeed, the representation was false, to the knowledge of the party making it, this would be, in general, conclusive evidence of fraud; but if the representation was honestly made, and believed at the time to be true, by the party making it, although not true in point of fact, we do not think that this amounts to fraud in law." 14 *M. & W.* 651. In this case there was a sale of cotton by samples, and the samples were represented as fair. A part of the lot proved to be falsely packed. The purchaser had accepted the cotton and paid the purchase money, and he could not, therefore, repudiate the contract, and was remediless at law but in an action for damages. We cannot assent to the doctrine of this case. If

Smith and Shorter *vs.* Mitchell.

the purchaser, by samples, is without remedy unless he can prove a moral fraud—prove an intention to defraud—by proving the *scienter*, or in some other way, then he is at the mercy of the seller. The seller might know, he ought to know, by the representation he assumes to know, whether his samples are fair or not. He must be held to know or not, at his peril. It is not enough that he may believe what he states—he must be sure of his ground— his evidence must be sufficient at his peril. By his false statements—false in fact—he has got the purchaser's money and he has not got an equivalent. It is not right, or just, or honest, and he, in my judgment, is liable in damages for a fraud. Upon this point the Exchequer Chamber is at issue with the Supreme Court of the United States. That Court say, "We think we may safely lay down this principle—that whenever a sale is made of property not present, but at a remote distance, which the seller knows the purchaser has never seen, but which he buys upon the representation of the seller, relying on its truth, then the representation, in effect, amounts to a warranty; at least, that the seller is bound to make good the representation." 13 *Peters*, 42. To the soundness of this rule we yield our hearty assent. From this review of the leading English cases, both ancient and modern, it is obvious that there is quite a conflict of authority in Great Britain upon the question of the *scienter* in Courts of Law. The weight of authority, the paramount weight of opinion, if not the greater number of judgments, is against its materiality. Its immateriality has received the sanction of the *House of Lords*, of *Lords Mansfield*, *Kenyon*, *Abinger* and *Denman*, Sir *James Mansfield*, *Best*, *C. J.* and *Baron Alderson*. In addition to the cases referred to, the following may be consulted, as elucidating the subject : 4 *Taunt.* 847. 2 *East*, 314. 4 *Camp.* 22. 2 *Ld. Raymond*, 1118. 2 *M. & W.* 519. 4 *M. & W.* 337. 5 *Bing. N. C.* 97. 12 *East*, 632. 4 *Bing.* 66. 3 *Q. B.* 58. 2 *Cr. M. & R.* 157. 5 *B. & Ad.* 797. 3 *B. & Cr.* 623. 2 *East*, 488, *note*. 3 *B. & Ad.* 114. 1 *Wm. Bla.* 463.

Without reviewing the authorities in this country on the same question, (as this cause is to be determined upon equitable rather than legal principles,) I remark that they are also conflicting, but that the rule settled in *Chandler vs. Lopus*, seems most generally to have prevailed. I pass, now, to inquire how the questions made in this record, stand in Courts of Equity? And here, to

the inquirer the way is open and easy. He is in a more pleasant, if not a purer region. The mind is not so tightly laced or so straightly bound. He breathes more freely. The question is, whether a contract for the purchase of property will be set aside by a Court of Chancery, and the parties remitted to the position which they respectively occupied before the contract, in a case where the buyer acts upon the false representation of the seller, in relation to a material fact, whether its falsity be known to him at the time or not.

If a party intentionally, or by design, misrepresent a material fact, in order to mislead, or entrap, or cheat, or obtain an undue advantage of another, it is a plain case, it is what Mr. *Story* calls a "positive fraud in the truest sense of the terms." I need not enlarge upon a proposition so just and so plain.

[6.] The fraud may be practised by deeds or acts as well as by words, by artifices to mislead as well as by positive assertions. For example—in this case, if there was a fraud practised by Smith upon Mitchell, (and the Jury have found that there was,) it was done more by artifice than in words—by deeds rather than by representations. No doubt Mitchell was induced to take the note of Moore, upon the recommendation of Cunningham's letter mainly—a letter which, it is very apparent, Smith had procured to be written for the purpose of misleading and cheating Mitchell.

[7.] I find the rule of law which we recognize as governing this case, and as sustaining the judgment of the Court below, laid down with precision and perspicuity by Mr. *Story*, as follows: "Whether a party thus misrepresenting a fact knew it to be false, or made the assertion without knowing whether it were true or false, is *wholly immaterial.* For the affirmation of what one does not know or believe to be true, is equally, in morals and law, as unjustifiable as the affirmation of what is known to be positively false." *Story's Com. on Eq.* §193. This rule of manifest equity and sound morality, we have seen, was recognized in the British Courts of Law, by some of the most learned of the Common Law Judges. It ought not to be questioned in any Court professing to administer justice.

If the fact misrepresented is *known* to be false, then the fraud is positive, deliberate, and springs out of the mind and heart. The great rule of Christian equity, "Do unto others as you would

that others should do unto you," is violated, and an act of swindling imbues the conscience. The money of one man is abstracted by the sheer villainy of another, without any equivalent or reciprocity of benefits. In such a case, by universal consent, Courts of Equity will compel restitution. If the fact is neither known to be true or false, the affirmation of its truth is, in morals a falsehood, and in law a fraud. The turpitude in the latter case, by a nice balancing in the moral scales, may be considered as being a fraction less intense, and that is all the difference. The consequence to the injured party is the same in both cases, and the consequences to the healthfulness of contracts throughout the entire business world, if such delinquency was tolerated, would be, also, in both cases the same. In both cases there is an actual fraud, a moral fraud necessarily deducible from the affirmation of a fact which is false, and upon which another is induced to act to his injury. In all such cases the intervention of a Court of Chancery may be put upon the ground of fraud.

[8.] If the party affirming *believes* the fact to be true, but is mistaken, he is to be relieved from the imputation of a fraudulent intention—in morals he cannot be held as derelict—but in that case he has perpetrated a fraud in law, against which Equity will relieve, upon principles *ex equo et bono.* Natural justice will not permit one to retain the property of another, obtained through his own agency, and for which he has paid nothing.

To give applicability to the rule, as above stated, several things are necessary, to wit : First, the affirmation must be of a material fact, constituting an inducement or motive to the act of the other party, and by which he is misled. Without a doubt, in this case, the fact affirmed, to wit : the solvency of Moore and his sureties, was material, and constituted Mitchell's inducement to the contract. The solvency of Moore and his sureties was the moving element of the whole transaction, so far as Mitchell was concerned. Again, the misrepresentation must be in something in regard to which the one party places trust and confidence in the other. This was the case here. It was argued, that Mitchell did not place confidence in Smith's representations, because, by one witness, it was proven that he said that he placed no confidence in what he said. Whether he did or not, was a question for the Jury. If, however, he did not trust in Smith's representations, he, beyond all doubt, did trust in his acts, his devices, and partic-

ularly in the letter addressed to Smith by Cunningham, procured by Smith to be written to himself, and produced by Smith to Mitchell as proof of the solvency of Moore.

Nor does the rule apply to cases where the fact affirmed is of such a nature, that the other party had no right to place reliance on it, and it was his own folly to give credence to it, for Courts of Equity will not aid parties who will not use their own sense and discretion. This exception contemplates a case where both parties have equal opportunities and means of knowing the truth of the statement, and where, in the very nature of the transaction, it is unreasonable to believe that a sensible man would act upon the statement of the other side, and where, if he does, he must be considered as reposing a confidence not necessary, and not expected, and without ordinary sense and discretion. Such is not the case on this record.

[9.] The rule in Equity goes yet farther ; for if a party innocently, *by mistake*, misrepresents a fact, it is equally conclusive, for it operates as a surprise and imposition upon the other party. Equity will reform a contract where a mistake has been made, innocently by both parties, to the injury of one. This is an old head of Equity jurisdiction. A mistake by one is as strong a ground for equitable interposition, as a mistake by both. With stronger reason will it interfere and set aside a contract, when the affirmation is not by mistake, innocently, but wilfully, with knowledge of the falsity of the fact, or with criminal recklessness, not knowing whether the fact be true or false. As to the last proposition, see *Pearson vs. Morgan,* 2 *Bro. Ch. Rep.* 389. *Burrows vs. Locke,* 10 *Vesey,* 475. *DeManville vs. Compton,* 1 *Vesey & B.* 355. *Ex parte Carr,* 3 *Ves. & B.* 111. 1 *Marsh on Ins. b.* 1, *ch.* 10, §1. *Story's Com. on Eq.* §193. *Rogers vs. Atkinson et al.* 1 *Kelly's R.* 12. 13 *Peters' R.* 26.

I shall not attempt to illustrate or sustain by reasoning farther the doctrine of the immateriality of knowledge of a fact represented as true, in order to rescind a contract in a Court of Equity, but refer to the following authorities as fully sustaining it. 11 *Maddock Chancery,* 208. *Neville vs. Wilkinson,* 1 *Bro. Ch. Cas.* 546. *Ainsly vs. Medlicot,* 9 *Vesey,* 21. 2 *Bro. Ch. Cas.* 385. 1 *Vern.* 136. *Fulton's Ex'rs vs. Roosevelt,* 5 *Johns. Ch. R.* 174. 2 *Cowen,* 129. *McFerran vs. Taylor & Massie,* 3 *Cranch,* 281. 6 *Vesey R.* 180, 189. *Jeremy,* 385, 386. *Smith vs. Richards,* 13 *Peters,* 26.

*Grans vs. White, Freem. R.* 57.   *Laidlaw vs. Organ,* 2 *Wheat. R.* 178, 195.   *Smith vs. The Bank of Scotland,* 1 *Dow. Parl. R.* 272.   *Lowndes vs. Lane,* 2 *Cox's R.* 363.   3 *Meriv. R.* 704.   2 *Kelly,* 66.   4 *Ga. R.* 95.

Let the judgment be affirmed.