Rutland vs. Hathorn.

RODERICK RUTLAND, plaintiff in error, vs. THOMAS HATHORN, defendant in error.

NOTE.—WARNER, C. J., did not preside in this case.

1. Upon a petition to establish a copy of a lost promissory note, and issue joined as to the making of the note, the parties are entitled to a trial by a petit jury, with a right to appeal to a special jury.
2. This right may be waived by consent, and the case submitted, in the first instance, to a special jury.
3. If the case be submitted to a special jury, the parties have no right of appeal.
4. In civil cases, it is within the legal discretion of the Court to allow the jury to be polled or not.
5. If the jury, after agreeing upon their verdict, disperse by consent of the parties, the Court is not bound, upon the subsequent return of the verdict, to poll the jury.
6. A juror will not be heard in impeachment of his own verdict.
7. Declarations made by a party in his own favor, to be admissable as part of the res gestœ, must be shown by proof to have accompanied the act, or to have been so nearly connected therewith in time, as to be free from all suspicions of after-thought.

8. This Court will not grant a new trial on a mere preponderance of evidence against the verdict, and the charge of the Court, though this Court may differ with the jury as to the preponderance of proof, provided there be sufficient evidence to support the finding, especially when the Circuit Judge refuses to grant a new trial.

Rule to establish note. Polling jury. Tried before Judge SPEER. Monroe Superior Court, February Term, 1867.

Roderick Rutland alleged that he had had a promissory note made by Thomas Hathorn, payable to him, or bearer, for Sixty Dollars, dated 22d June, 1862, and due one day after date, and that said note was lost, and obtained a rule *nisi*, calling on Hathorn to show cause why a copy should not be established. For cause, Hathorn plead that he never executed such note.

At the trial, a special jury was empanelled to try said issue, neither party objecting, and both parties assenting thereto, as the Court understood.

The plaintiff swore that about the date of the note aforesaid, he was at Russelville; the tax receiver and collector and others were there. Witness was at the table attending to some business, when Hathorn asked a loan of $60, to send to his son, Asbery, in the army. Witness loaned him the money and took his note therefor; afterwards, being very sick, and thinking he would die, he sent for Ben Zellner to write his will; gave Zellner his pocket-book containing most of his notes; Zellner and Rufus Cheney looked through his papers; Zellner took them off and kept them two or three months and brought them back. Witness did not know whether Hathorn's note was in the book or not, as he was very sick. The federal army destroyed his papers except some small notes and certificates. The Hathorn note is lost or destroyed; witness has not seen it since.

Upon cross-examination, he stated that he was certain that he loaned the money at Russelville; James Harrell was present, and he thinks Mr. Blount, the collector and receiver, and others were. Thomas Hathorn always had money, and his asking to borrow, surprised witness; had loaned him $5

once before; had a note on him about 1840 or 1841, for $300, which was paid, $10 or $15 at a time, during two or three years. Witness had a note on Thomas J. Hathorn (usually called Jack) for $50, loaned to buy corn, before the war, and does not think it was paid; he told Cheeves and John Maynard, some year or two ago, that he thought it was paid, or asked them if it was not paid. Maynard was Jack's administrator. He told Monroe Hathorn about it; he (Monroe) tried to make witness believe that it was Jack's note he had had, and not Thomas', but witness told Monroe that he had had a note on Thomas too. He told Monroe he thought Jack's note was paid; things were so torn up he could not recollect well. Zellner took the large pocket-book; Jack's note was in the small one, in which witness usually carried his due notes, and such as he could collect.

Plaintiff closed.

Defendant was sworn. He roundly denied borrowing the money or giving the note, or being at Russelville that year on any public day. He said he had, at that time, plenty of money at home, and in the bank at Forsyth; has never since 1855, had less than $1,000 on hand; was careful to have no notes out; could not rest when he had a note out till it was paid. The note held in 1840 or 1841 was given to Mixon for a negro; he paid it in small, but frequent payments.

Upon cross-examination he stated that he did not recollect being at Russelville in 1862; that he did not see Blount or Harrell there. He knows he did not borrow the money; has had no money dealings with plaintiff since he paid the Mixon note; don't recollect when his son died; it was 1861 or 1862.

BEN PYE swore: that defendant always had money; kept deposited with him in bank at Forsyth since 1855–6, sometimes as much as $1,500; he had money on deposit in 1862; he thinks as much as $1,000, but could not tell as the books were gone. Defendant is prompt and punctual and witness considers him straight in his dealings, and so is the plaintiff.

CHEEVES sworn, said: that a year or two after Jack Hathorn's death, plaintiff asked him if Jack Hathorn's note had

not been paid,. and witness told him Jack's wife said it had not. It was the $50 note aforesaid. Witness wrote the note; it was for borrowed money.

MONROE HATHORN swore: that hearing of the difficulty between plaintiff and his father, he tried to convince plaintiff that he had mistaken Jack's note for his father's, but plaintiff said he had a note on father too.

It was admitted that Maynard, the administrator of Jack Hathorn, never paid the $50 note.

Defendant closed, and plaintiff in rebuttal examined BEN ZELLNER, who substantially states what plaintiff did as to his and Cheney's visit to plaintiff in 1864, when plaintiff was sick. There were many valuable notes in the pocket-book, among them one on defendant; recollects it from the fact that the name signed to it was very hard to make out; could not tell whose it was for some time; had to examine it closely to make out the name; the note was for some amount under $100; can't recollect whether it was on Thomas or Thomas J. Hathorn; kept the notes two or three months and returned them to plaintiff, who was quite sick then, and off and on feeble since.

JAMES HARVELL testified that he was at Russelville in the summer of 1862, when the tax collector and receiver was there, and other persons also; it was on a public day; saw plaintiff and defendant there; went to the table where they were, and saw plaintiff hand defendant some bills; don't know how much; there were four or five of them; they were new and attracted witness' attention; very soon after—perhaps a minute after—he walked away and left them; don't recollect seeing a note given; recollects seeing Henry Gregory there.

HENRY GREGORY sworn, said: he was at Russelville in 1862 on a public day; saw Blount, plaintiff and Harvell there; does not recollect to have seen defendant there.

Plaintiff proposed to prove by Gregory that on the day plaintiff loaned the money at Russelville as aforesaid, as he was starting home, he met the witness and said to him: "There goes Thomas Hathorn, to whom I have just loaned $60, and I am surprised that he should be borrowing money." Defend-

ant objected, and the objection was sustained by the Court. In the agreed brief of evidence is the following : "The affidavit of defendant to his plea was before the jury, and his signature very badly written and hard to be made out. The plaintiff and defendant both are men of advanced age."

The evidence being closed, the Court charged the jury that when the testimony of witnesses is conflicting, they should reconcile it if possible, but if it cannot be done, then they should find according to the preponderance of evidence.

By consent, it was agreed that the jury, after finding a verdict, might disperse, and render it in Court next morning. When the verdict was about to be delivered, plaintiff's attorney requested leave to poll the jury, which was refused. The verdict was for defendant. A new trial was moved for : because the verdict was contrary to the law and evidence, and the principles of justice and equity, etc., and against the charge of the Court : because the Court erred in rejecting the testimony of Henry Gregory as aforesaid : because the Court erred in not allowing the jury to be polled : because the verdict was not unanimous, and because it was error to try said case before a special jury.

In support of this motion, plaintiff read the affidavit of Jesse Aycock to the effect, that he did not believe the verdict was right, that he and three others of the jury disagreed to it, but rather than make a mistrial, submitted to the majority, and further, that on account of his health and advanced age, he was unable to stay in the jury room and contest the verdict, and therefore consented, though then and yet he thought it wrong.

The Court refused a new trial, and for that plaintiff in error seeks a reversal.

CABANISS & PEEPLES, A. D. HAMMOND, for plaintiff in error.

R. P. TRIPPE, for defendant in error.

WALKER, J.

This is an unfortunate controversy about a small matter between two old men, neighbors, of good character, and who have got into this trouble owing to the confusion incident to the war.   Both are equally honest in this matter, doubtless, but owing to the excitement of the times, and the frailty of memory, a misunderstanding has arisen, which it is very difficult, if not impossible to adjust satisfactorily.   In this state of uncertainty, we are disposed to leave the case where the Court below left it.   The jury having decided the question upon the evidence, which is admitted to be conflicting, and the Court having declined to grant a new trial, and there having been no error in law committed by the Judge, we think it best for both litigants that there should be an end to this lawsuit.

1. The parties were entitled to have this case submitted first to a petit jury, from whose finding, either could have entered an appeal.   Taylor vs. Holland, 20 Ga. Rep., 11.

2. This right may be waived, however, by consent, as is done almost daily, and the case transferred from the common-law to the appeal docket, without trial at common-law before a petit jury.

3. In this case the issue was submitted to a special jury, not only without objection, but "both parties assenting thereto, as understood by the Court."   It may be possible that it did not occur to the learned counsel, at the moment, that the parties were entitled to a trial before a petit jury, though the familiarity with the decisions of this Court ever manifested where these counsel appear before us, would go far to rebut this idea ; or it may be that both parties being ready, wished, by a single trial, to end an unfortunate litigation between neighbors, and therefore intentionally went before a special, in preference to a petit jury ; which latter, from our knowledge of the counsel and the facts of the case, we are disposed to adopt as the true hypothesis.   Be this as it may, the

parties having, without objection, gone to trial before a special jury, in the first instance, they must be held to have waived their right to a trial before a petit jury, and as a consequence their right to appeal, and must be bound by a decision made by the tribunal of their own selection.

4 and 5. It was agreed by the parties that the jury, after agreeing might disperse, and return their verdict next morning. When the verdict was returned into Court next morning, plaintiff's counsel asked leave to poll the jury, which was refused by the Court, and this is alleged as error. In Smith *et al.* vs. Mitchell, 6 Ga. Rep., 465, this Court says: "It is our judgment, that in civil cases it is discretionary with the presiding Judge to poll the jury or not. It is proper, however, to say that the jury ought to be polled, whenever there is any good reason to believe, no matter how the fact is manifested, that any one of the jury has not agreed to the verdict." "The motion to poll the jury was properly refused, because the jury had dispersed before it was made. We are clear that the only safe general rule is to deny the application in all such cases;" p. 466. This fully sustains the ruling of the Court below.

6. A new trial was moved on the ground, also, that the verdict was not unanimous. In support of this ground, the only evidence was the affidavit of one of the jurymen. It would seem that some questions cannot be considered as settled by judicial decision. In Coleman vs. The State, 28 Ga. Rep., 84, this Court says: "the affidavit of a juror, made after the rendition of his verdict, is not admissable to impeach the verdict. *This is well settled.*" See also, Brown vs. The State, Ib. 217. McElvin vs. The State, 30 Ga. Rep. 869.

7. Should the Court have admitted the testimony of Henry Gregory? It was argued that this testimony was admissable as part of the *res gestæ.* Our Code, Section 3696, says:— "Declarations *accompanging* an act, or so *nearly* connected therewith *in time,* as to be free from all suspicions of device or after-thought, are admissable in evidence as part of *res gestæ.*" How nearly connected in time was the statement made by plaintiff to the principal fact, the alleged loaning of

the money ?  It was on the same day it seems, at the same place, as plaintiff was starting home.  But how long did it occur after the alleged loaning of the money ?  Gregory did not recollect seeing defendant there at all, though a portion of the proposed testimony was : "there goes Thomas Hathorn," and would seem to imply that defendant was at the time within the sight of the witness.  Mr. Greenleaf says the declarations "must be concomitant with the principal act, and so connected with it as to be regarded as the mere result and consequence of the coexisting motives, in order to form a proper criterion for directing the judgment which is to be formed upon the whole conduct."  1 Greenleaf, Ev. Sec. 110.  The evidence proposed was not shown to accompany the act, was not concomitant with it, nor sufficiently near in time to be admissible as part of the *res gestœ.*  It may have occurred in a short time after the principal act, or it may have been one, two, five, or even ten hours afterwards.

8. Should a new trial be granted because the verdict is against the evidence and the charge of the Court ?  In Doe ex. dem. Hanby *et al.,* vs Roe cas. ej., and Tucker tenant, 28 Ga. Rep., 485, this Court says : "We think the verdict contrary to the weight of evidence in this case; but not so strongly and decidedly so, as to authorize a new trial, especially when it has been refused by the Circuit Judge who presided on the trial of the cause."  In Diomatari vs. Choate *et al.,* Ib. 320, this Court holds that : "Notwithstanding the Court may differ with the jury as to the preponderance of the proof, yet the verdict will not be disturbed upon a naked question of fact, provided there be sufficient evidence to support the finding ; especially where the Circuit Judge is satisfied, and refuses to grant a new trial."  See also, Smith vs. Smith, 29 Ga. Rep., 365.  These authorities are conclusive in this case.  There is positive testimony here on both sides, and it is difficult to determine in favor of which side it preponderates.  It seems to be pretty well balanced, and is just such a case as can be better decided by a Court and jury of the vicinage, than by this Court, upon a mere written statement of what occurred on the trial.  Upon the whole, we think the

law has been fairly administered in this case, and that it is better for the parties that this litigation be ended.

Judgment affirmed.